# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 08-3148

_____

Douglas W. Rush,                                    *
                                                    *
        Plaintiff - Appellee,                       *
                                                    *   Appeal from the United States
        v.                                          *   District Court for the
                                                    *   Eastern District of Arkansas.
Barbara Perryman, Individually and in               *
her Official Capacity as Member of the              *
Ozarka College Board of Trustees;                   *
Bonnie Wyatt, Individually and in her               *
Official Capacity as Member of the                  *
Ozarka College Board of Trustees;                   *
Bennie Cooper, Individually and in his              *
Official Capacity as Member of the                  *
Ozarka College Board of Trustees;                   *
George Thomas, Individually and in his              *
Official Capacity as Member of the                  *
Ozarka College Board of Trustees,                   *
                                                    *
        Defendants - Appellants,                    *
                                                    *
Sharon Mathis, in her Official Capacity             *
as Member of the Ozarka College                     *
Board of Trustees; Paul Balentine, in               *
his Official Capacity as Member of the              *
Ozarka College Board of Trustees;                   *
Ozarka College; Dennis Wiles, in his                *
Official Capacity as Member of the                  *
Ozarka College Board of Trustees,                   *
                                                    *
        Defendants.                                 *

_____

Submitted: March 12, 2009
Filed: September 3, 2009
_____

Before SMITH, GRUENDER, and BENTON, Circuit Judges.
_____

SMITH, Circuit Judge.

Douglas Rush, former President of Ozarka College, sued members of the Ozarka College Board of Trustees ("the Board"), alleging in ten causes of action that members of the Board violated some of his state and federal statutory and constitutional rights. The district court[1] concluded that Rush only stated valid claims under the First and Fourteenth Amendments and dismissed the remainder of his claims. The court denied the Board qualified immunity with respect to Rush's First and Fourteenth Amendment claims, finding that Rush's rights under those provisions were clearly established. The Board challenges the court's denial of qualified immunity on interlocutory appeal.[2] We affirm.

## I. *Background Facts*

Rush served as president of Ozarka College, a two-year college located in Melbourne, Arkansas for 12 years before the Board terminated his employment for, in its words, "dishonesty, insubordination, failure to comply with state laws, and willful disregard of board policy after being warned that this would not be tolerated."

_____

[1] The Honorable Brian S. Miller, United States District Judge for the Eastern District of Arkansas.

[2] We have jurisdiction of this issue because a "district court's denial of a claim of qualified immunity, to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of 28 U.S.C. § 1291 notwithstanding the absence of a final judgment." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985).

-2-

Rush's problems apparently began when the Institutional Improvement Committee ("Committee"), a standing committee that Rush appointed, came to Rush wanting to pursue the creation of a fitness center for the campus. Pursuant to Arkansas law, state purchases exceeding $25,000 must be made through a competitive sealed bidding process. Ark. Code Ann. § 19-11-229. But, instead of soliciting sealed bids, the Committee obtained cost estimates from three companies and chose a vendor. Due to the rising cost of steel, the Committee purchased the exercise equipment in two lots in consecutive fiscal years—the first lot totaling $23,667.87 and the second lot totaling $24,148.01. Gayle Cooper, Vice President of Finance, expressed concern about dividing the purchases of the fitness equipment. A legislative audit revealed the split purchases and noted that the two payments "appeared to have been split to circumvent the required bidding procedures." Members of the Board attended a May 2005 audit committee meeting at which Rush testified. At that meeting, Rush blamed the suspect purchase on an "overzealous librarian."

In the spring of 2005, members of the Board became concerned about Rush's performance as president after he failed to follow Board policy and procedure during a nonrenewal of a teacher's contract. Additionally, at the Board's annual meeting on May 26, 2005, members of the Board questioned Rush about the split purchase of fitness equipment and Rush placed responsibility on Gayle Cooper. As a result, the Board believed that Rush had dishonestly and suspiciously shifted blame from an "overzealous librarian" to Cooper. A few weeks later, on June 13, 2005, the Board held an executive session and questioned Cooper regarding the purchase. Cooper claimed that he was not involved in the purchase.

Sometime after this meeting, Rush responded to a press inquiry asking whether the Board was holding illegal meetings. Rush responded that he believed that the Board had held two illegal executive sessions, one occurring on May 26, 2005, and the other on June 13, 2005.

One member of the Board contacted the Arkansas Attorney General's office for advice on how to discipline or terminate Rush. Assistant Attorney General Don Barnes advised the Board to call a special meeting, announce that it was going into executive session to discuss Rush's contract, and call Rush into the session to discuss the Board's concerns. Barnes also advised the Board to explain the problems to Rush and allow him an opportunity to respond. According to Barnes, after allowing Rush an opportunity to respond, the Board should then return to open session and make any disciplinary decision based on a motion and vote.

Following this advice, a special Board meeting was called to discuss Rush's employment contract. Rush was given the floor to present his president's report, but instead he accused the Board of conspiring to fire him. The Board then went into executive session to discuss Rush's employment. In the executive session, Rush confronted the Board regarding his contract. After the executive session, the Board resumed the open meeting where a motion was made and seconded to terminate Rush's contract for dishonesty, insubordination, failure to comply with state laws, and willful disregard of Board policy after being warned that this would not be tolerated. The majority of the Board voted to terminate Rush's employment. Rush's attorney did not ask to speak during the open session. About a month after this meeting, Rush requested a name-clearing hearing, and the Board denied this request.

Following his termination, Rush brought an action under 42 U.S.C. § 1983 against members of the Board, alleging that they terminated his employment in violation of the United States Constitution, the Arkansas Constitution, the Arkansas Civil Rights Act, the Arkansas Freedom of Information Act, and the Arkansas Whistle-Blower Act. The district court dismissed all claims except Rush's First Amendment claim of retaliation for speaking to the press and his Fourteenth Amendment due process claim. The Board members filed a motion for summary judgment on these two claims, arguing that they were entitled to qualified immunity.

The district court granted the Board members' summary judgment motion as to Rush's First Amendment claim, concluding that Rush's speech was not a protected activity. The court also granted the Board members' summary judgment motion as to Rush's due process claim based on a property interest because Rush received sufficient due process before his employment was terminated. But the court denied the Board members' summary judgment motion as to Rush's procedural due process claim based on a liberty interest. The court concluded that the Board was not entitled to qualified immunity because Rush's right to a name-clearing hearing was clearly established. The Board members filed an interlocutory appeal on the denial of qualified immunity.

II. *Discussion*

A. *Standard of Review*

On appeal, the Board members argue that they are entitled to qualified immunity on Rush's due process claim based on a liberty interest. They contend that any right to receive a post-termination name-clearing hearing, in addition to a pre-termination hearing, was not clearly established. We review the denial of a qualified immunity defense under a de novo standard of review. *Duckworth v. St. Louis Metro. Police Dep't*, 491 F.3d 401, 405 (8th Cir. 2007).

Previously, the Supreme Court required that, in order to resolve a claim of qualified immunity, a court must decide if the conduct violated a constitutional right before considering whether the right was clearly established. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). The Court recently revisited *Saucier* and overruled its mandate. *Pearson v. Callahan*, 129 S. Ct. 808, 818 (2009); *see also Serna v. Goodno*, 567 F.3d 944 (8th Cir. 2009) (explaining *Pearson*). The Court held that although *Saucier*'s sequence "is often appropriate, it should no longer be regarded as mandatory." *Pearson*, 129 S. Ct. at 818. Specifically, the Court stated that "[t]he judges of the district courts and the courts of appeals should be permitted to exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis

-5-

should be addressed first in light of the circumstances in the particular case at hand." *Id.*

## B. *Due Process Clause Liberty Interest*

An "employee is entitled to procedural due process only when he has been deprived of a constitutionally protected . . . liberty interest." *Winegar v. Des Moines Indep. Cmty. Sch. Dist.*, 20 F.3d 895, 899 (8th Cir. 1994). "An employee's liberty interests are implicated where the employer levels accusations at the employee that are so damaging as to make it difficult or impossible for the employee to escape the stigma of those charges." *Id.* This stigma may be established where the employee is accused of actions involving "dishonesty, immorality, criminality, [and] racism . . . ." *Id.*

An unconstitutional deprivation may occur when an employee is not given an opportunity to clear his or her name. *Stodghill v. Wellston Sch. Dist.*, 512 F.3d 472, 476 (8th Cir. 2008); *Coleman v. Reed*, 147 F.3d 751, 755 (8th Cir. 1998). To establish an unconstitutional liberty interest deprivation, the plaintiff must establish that: (1) he was stigmatized by the statements; (2) those statements were made public by the administrators; and (3) he denied the stigmatizing statements. *Coleman*, 147 F.3d at 755.

Here, Rush's employment was terminated in an open session of the Board for alleged misconduct including dishonesty—an accepted stigmatizing charge. *See Winegar*, 20 F.3d at 899. Following the termination of his employment, Rush requested a name-clearing hearing via letter. The Board denied the request. The district court concluded, based upon the record before it, that Rush had sufficiently established the elements required to prove an unconstitutional liberty interest deprivation to avoid summary judgment. *See Coleman*, 147 F.3d at 755. We agree.

-6-

## C. *Qualified Immunity*

Qualified immunity protects "'[g]overnment officials performing discretionary functions.'" *Bankhead v. Knickrehm*, 360 F.3d 839, 843 (8th Cir. 2004) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982) (alteration in *Bankhead*)). "Government officials are generally shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. Thus, we decide whether a defendant is entitled to qualified immunity according to an objective standard." *Id.* (internal quotations and citations omitted). "A right is clearly established, for qualified immunity purposes, if the 'contours of the right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Murphy v. State of Ark.*, 127 F.3d 750, 755 (8th Cir. 1997) (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (alteration in *Murphy*)).

In seeking qualified immunity, the Board members contend that it was objectively reasonable to believe that a second hearing was not required. The members assert that Rush's executive session hearing satisfied the Board's obligation to provide a name-clearing hearing. The Board argues that the contours of Rush's right to a name-clearing hearing were not sufficiently clear that a reasonable Board member would understand that denying Rush's request for a name-clearing hearing after the conclusion of the Board meeting would violate his right. The Board members also assert that this case is sufficiently similar to *Coleman* to be controlled by its holding that a plaintiff receives all the process to which he or she is entitled by a pre-termination hearing. *Coleman*, 147 F.3d at 754. The Board members misperceive the clarity of the law with respect to name-clearing hearings and misinterpret *Coleman*'s authority.

In *Coleman*, a school principal brought suit against school administrators for firing her after they found out that she had failed to disclose a previous felony on her application. *Id.* at 753. The administrators distributed a flier to elementary students

disclosing the principal's felony. *Id*. She alleged a deprivation of her property and liberty interests, and the administrators asserted qualified immunity. *Id*. The district court denied the administrators' motion. *Id*. On appeal, we presumed a property interest but held that the pre-termination process granted to the principal was adequate to protect her property interest. *Id*. As to the liberty interest, we reversed the district court's denial of qualified immunity to the administrators because the principal never denied the stigmatizing charges. *Id*. at 755. We held that, although the school administrators did not have to prove the falsity of the charges, the principal at least had to deny the substantial truth of the charges. *Id*. Because she had never denied the charges, she was not entitled to a name-clearing hearing. *Id*.

Conversely, Rush repeatedly denied the charges during the executive session, which occurred before the stigmatizing statements were made by the Board. A hearing must occur "at a meaningful time and in a meaningful manner." *Goldberg v. Kelly*, 397 U.S. 254, 267 (1970) (internal quotations and citations omitted). The Board's executive session did not occur at a meaningful time, which would have been after the stigmatizing statements were made. Requiring Rush to clear his name prior to any publication of the stigmatizing statements does not follow from *Coleman*'s holding and does not satisfy *Goldberg*'s due process requirements. *See, e.g.*, *Hade v. City of Fremont*, 246 F. Supp. 2d 837, 846 n.1 (N.D. Ohio 2003) (finding that because the name-clearing hearing occurred before dissemination of the stigmatizing statements, those hearings were not adequate for name-clearing purposes under the Due Process Clause). Moreover, whereas the allegedly stigmatizing statements were made during open session, the executive session was closed to the public. Thus, the executive session hearing did not allow Rush the opportunity to rebut the allegations to all those to whom it was published. *See, e.g., Patterson v. City of Utica*, 370 F.3d 322, 337 (2d Cir. 2004) (holding that a due process violation occurred because the plaintiff was only allowed to rebut stigmatizing statements to *some* of the community leaders who originally heard the statements).

The Board members' argument that their executive session, which was held before the stigmatizing statements were made public, provided Rush an adequate name-clearing hearing ignores our relevant precedent. In fact, we have implied that, in some cases, a pre-termination name-clearing hearing may also be required. In *Winskowski v. City of Stephen*, a city councilperson called a city police chief a liar during an open grievance hearing at which the police chief was fired. 442 F.3d 1107, 1109 (8th Cir. 2006). During a closed session immediately prior to his termination, the police chief was given the opportunity to speak. *Id*. He did not seek another hearing, choosing instead to file suit alleging a deprivation of liberty interest. *Id*. Relying on *Cleveland Board of Education v. Loudermill*, 470 U.S. 532 (1985), we stated that the plaintiff received an adequate pre-termination name-clearing hearing. *Winskowski*, 442 F.3d at 1110. We explained that the police chief was not deprived of a post-termination name-clearing hearing because he had not requested one. *Id*. at 1110–11.

*Winskowski* is instructive because Rush also attended the very meeting where the stigmatizing statements were made. But, unlike the police chief in *Winskowski*, Rush actually requested a post-termination name-clearing hearing. Rush's right to a post-termination name-clearing hearing was clearly established. The district court did not err in denying the Board members' summary judgment motion on qualified immunity grounds.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____