[Cite as *Hemphill v. Dayton*, 2011-Ohio-1613.]

IN THE COURT OF APPEALS FOR MONTGOMERY COUNTY, OHIO

ROBERT L. HEMPHILL, et al.                :

    Plaintiffs-Appellants          :          C.A. CASE NO.    23782

v.                                        :          T.C. NO.    2006CV715

CITY OF DAYTON, et al.                    :          (Civil appeal from
                                                     Common Pleas Court)

    Defendants-Appellees           :

                                          :

        . . . . . . . . . .

## **O P I N I O N**

Rendered on the ___1st___ day of _____April_____, 2011.

        . . . . . . . . . .

DWIGHT D. BRANNON, Atty. Reg. No. 0021657, 130 West Second Street, Suite 900, Dayton, Ohio 45402
    Attorney for Plaintiffs-Appellants

NEIL F. FREUND, Atty. Reg. No. 0012183 and LEONARD J. BAZELAK, Atty. Reg. No. 0064023, One Dayton Centre, 1 S. Main Street, Suite 1800, Dayton, Ohio 45402
    Attorney for Defendants-Appellees

        . . . . . . . . . .

FROELICH, J.

{¶ 1} Robert L. Hemphill appeals from a judgment of the Montgomery County Court of Common Pleas, which overruled his motion for judgment notwithstanding the verdict and, in the alternative, for a new trial, after a jury rejected his claims against the City of Dayton and some of

its employees.   The claims related to the termination of Hemphill's employment with the City.

{¶ 2} For the followings reasons, the judgment of the trial court will be affirmed.

I

{¶ 3} In 2004, Hemphill was retired from the Air Force and had been unemployed for an extended period of time, but he continued to seek work.   In the fall of 2004, Hemphill applied for the position of Major with the Dayton Police Department.   On February 4, 2005, Hemphill filed a bankruptcy petition; attorney Ruth Slone was assigned to be the bankruptcy trustee for Hemphill's case.

{¶ 4} Hemphill   interviewed for the position with the police department in early February 2005, and he was hired on February 14, 2005, ten days after he filed his bankruptcy petition.   The annual salary for the position was $85,000.   Hemphill began working for the City on February 16, 2005.   Hemphill did not immediately inform the bankruptcy court of his new position.

{¶ 5} On April 6, 2005, Hemphill attended a meeting of creditors in the bankruptcy court with his attorney.   He did not inform the bankruptcy trustee of his employment at that hearing, and he had not yet amended his petition to reflect his employment.

{¶ 6} When Hemphill entered the bankruptcy court on April 6, he was not in uniform, but the security officers noticed that he put a Dayton Police Department major's badge in the coin bowl.   Because the security officers did not recognize Hemphill, they called the police department to inquire whether he was properly in possession of the badge.   Hemphill's presence at the bankruptcy court was reported to Deputy Police Chief Wanda Smith, who knew that Hemphill was supposed to be on duty and that on-duty officers are supposed to be in uniform.   After consulting with Police Chief Julian Davis, Smith asked a detective to investigate why

Hemphill had been at the bankruptcy court out of uniform. The detective accessed bankruptcy court records and contacted Trustee Slone, then reported to Smith that Hemphill had a bankruptcy case pending and that his bankruptcy paperwork did not list any employment. Davis and Smith subsequently met with Slone at her office to discuss the case.

{¶ 7} Within the next few days, on April 19, Chief Davis, Deputy Chief Smith, and Assistant City Manager Rashad Young met with Hemphill at the City Manager's office. They questioned Hemphill about his bankruptcy petition and, specifically, the fact that it did not list any employment. In response, Hemphill stated that he "had $20,000 of his own money invested in his 2003 [Ford] Explorer" that he did not want to lose, so he filed a bankruptcy petition. He did not explain why he did not list his employment. The City officials decided that Hemphill had been dishonest with the court, and they offered him the option to resign or be fired. Hemphill resigned.

{¶ 8} On January 27, 2006, Hemphill filed a complaint against the City for wrongful discharge and against Trustee Slone for tortious interference with a business relationship and defamation. Slone filed a notice of removal to the bankruptcy court, invoking the *Barton* doctrine,[1] which bars a party, without prior permission of the bankruptcy court, from suing a bankruptcy receiver or trustee for an act done in his or her official capacity. After a hearing, the bankruptcy court concluded that Slone had acted appropriately in discussing Hemphill's case with City officials as part of her duty to investigate the debtor's employment. Thus, the court concluded that Slone was entitled to immunity for her actions, denied Hemphill permission to sue

---

[1] *Barton v. Barbour* (1881), 104 U.S. 126, 26 L.Ed. 672.

her, and dismissed Hemphill's claims against Slone. The bankruptcy court remanded the wrongful discharge action against the City to the court of common pleas.

{¶ 9} After the case was remanded, Hemphill (and his wife) filed an amended complaint against the City and certain of its employees, stating causes of action for tortious interference with a business relationship, defamation, wrongful discharge, denial of due process, fraud, misrepresentation, concealment, negligent misrepresentation, breach of fiduciary duties, ultra vires, duress, coercion, conspiracy, "separate right to remedy under 11 U.S.C. §525," infliction of emotional distress, civil rights violations, invasion of privacy, malicious prosecution, loss of consortium, and "incorporation of administrative claims." Hemphill sought reinstatement with back pay, pre- and post-judgment interest, costs, attorney fees, and "other relief." Hemphill named and served the following defendants: the City, Police Chief Davis, and Deputy Chief Smith.[2] We will refer to them collectively as "the City."[3] The City filed an answer and raised twenty-three affirmative defenses.

{¶ 10} In December 2007, Hemphill filed a motion for summary judgment on several of his claims and on the City's affirmative defenses. The City also filed a motion for summary judgment. On the date that each of these motions was filed, the respective parties requested leave to file briefs in excess of the twenty-page limit. Hemphill later sought leave to file a response in excess of twenty pages as well. The trial court denied all of the motions to file briefs in excess of the page limits, stating that it would review the briefs already filed "up to and including page

---

[2]These titles reflect the defendants' positions at the time of Hemphill's termination.

[3]Major Jerry Smith was also listed as a defendant in the amended complaint, but Hemphill later voluntarily dismissed all claims against him.

twenty."

{¶ 11} While the summary judgment motions were pending, Hemphill filed motions in limine to preclude evidence that he acted dishonestly in the bankruptcy proceedings and to preclude the bankruptcy trustee from testifying at trial. The City filed a motion in limine to prohibit any reference to the bankruptcy court's comment, in its ruling that Hemphill could not sue Slone, that it "was left with the impression that [Hemphill] was acting in accordance with his attorney's advice and was not attempting to mislead" the court or the trustee.

{¶ 12} In May 2008, the trial court overruled Hemphill's motion for summary judgment in its entirety. It also granted in part and overruled in part the City's motion for summary judgment. Specifically, the trial court granted summary judgment in favor of the City on the following claims: tortious interference with a business relationship, defamation, denial of due process, and negligent misrepresentation. The trial court overruled the City's motion for summary judgment with respect to the claims for wrongful discharge, fraud, constructive discharge, common law conspiracy, infliction of emotional distress, Hemphill's civil rights claims, and his claim for "separate right to remedy under 11 U.S. Code § 525."[4] Because the trial court had denied the parties' motions to file briefs in excess of the page limit, it did not specifically rule on the City's request for summary judgment with respect to the following claims, which were discussed on pages 21 and beyond: invasion of privacy, abuse of process and malicious prosecution, loss of

---

[4] In the amended complaint, one count encompassed the claims for "Fraud, Misrepresentation/Concealment/Negligent Misrepresentation, Breach of Fiduciary Duty, Ultra Vires." The trial court expressly denied the City's motion for summary judgment on fraud and granted summary judgment on negligent misrepresentation. Based on our review of the record, it appears that Hemphill did not pursue and offered no support for the claims of concealment, breach of fiduciary duty, or ultra vires. As such, we infer that, with the exception of the fraud claim, the trial court granted summary judgment in favor of the City on all of the other claims contained in this count.

consortium, and "incorporation of administrative claims."

{¶ 13} The trial court also overruled Hemphill's motion in limine to prohibit the City from arguing that he had acted dishonestly during his bankruptcy proceeding and to prohibit Trustee Slone from testifying at trial. The trial court found that, because the issue of Hemphill's honesty was not fully addressed in the bankruptcy court, collateral estoppel did not prohibit "relitigation" of that issue. The trial court also noted that, at the hearing in the bankruptcy court, the bankruptcy judge stated his intention "that no one was going to be bound by any representations made during the hearing, [and] that he was trying to keep this hearing 'from being used in some evidentiary manner in a subsequent proceeding.'" The trial court overruled Hemphill's motion in limine to exclude Trustee Slone's testimony, because this motion was also based on Hemphill's "unpersuasive" claim that his honesty had already been established in the bankruptcy court proceedings. For the same reason, the trial court granted the City's motion in limine to prevent Hemphill from using the bankruptcy court's decision as evidence that he did not act dishonestly.

{¶ 14} Before trial, Hemphill voluntarily dismissed his claims for conspiracy, intentional infliction of emotional distress, and fraud. The trial court addressed various other pretrial motions.

{¶ 15} Hemphill's remaining claims were tried by a jury from October 6 through October 17, 2008. On October 15, 2008, after both parties had presented all of their evidence, Hemphill filed a Motion to Amend Pleadings to Conform to the Evidence, in which he sought to add claims for breach of contract and promissory estoppel. He also sought directed verdicts on these claims. The trial court overruled the Motion to Amend from the bench the same day, but commented that, pursuant to Civ.R. 15(B), Hemphill could "bring it again even after judgment."

{¶ 16} The jury returned general verdicts in favor of the City, Police Chief Davis, and Deputy Chief Smith. The jury also found, by interrogatory, that the City had not discharged Hemphill in violation of public policy as set forth in Section 525, Title 11, U.S.Code (hereinafter "11 U.S.C. §525(a)").

{¶ 17} On November 5, 2008, Hemphill filed a "Motion for Judgment Notwithstanding the Verdict; In the Alternative, Motion for New Trial" on his wrongful discharge and due process claims, as well as the breach of contract and promissory estoppel claims that were the subject of his motion to amend pleadings to conform to the evidence. He claimed that "no substantial evidence in support of the defense existed, especially in light of the clear misconduct of the defendant and their counsel." The court overruled this motion.

{¶ 18} Hemphill appeals from the denial of his motion for judgment notwithstanding the verdict and for a new trial, raising eight assignments of error. We will address these assignments in an order that facilitates our discussion.

II

{¶ 19} The standard of review for a motion for judgment notwithstanding the verdict is the same as that for a directed verdict: construing the evidence most strongly in favor of the party against whom the motion is directed, the motion must be overruled unless reasonable minds could reach no other conclusion but that, under the applicable law, the movant is entitled to judgment in his favor. Civ.R. 50; *Texler v. D.O. Summers Cleaners & Shirt Laundry Co.*, 81 Ohio St.3d 677, 679, 1998-Ohio-602; *Butler v. Stevens,* Montgomery App. No. 22822, 2009-Ohio-2775, ¶25. In other words, in reviewing the denial of a motion for judgment notwithstanding the verdict, we must determine whether the evidence, viewed in the light most favorable to the non-moving party,

was legally sufficient to support the verdict.    *Butler* at ¶51.

{¶ 20} We review the trial court's denial of a motion for a new trial for an abuse of discretion. *Miller v. Remusat,* Miami App. No. 07-CA-20, 2008-Ohio-2558, ¶32.   Where the evidence reasonably supports a jury's verdict and no manifest injustice is shown, a trial court properly denies a motion for a new trial. *White Bros. Partnership v. Encon, Inc.*, Montgomery App. No. 23771, 2010-Ohio-4767, ¶28;  *McMullin v. Johnsman*, Darke App. No. 07CA1720, 2008-Ohio-3488, ¶10.

III

{¶ 21} Hemphill's fourth assignment of error states:

{¶ 22} "THE JURY'S VERDICT IN APPELLEES' FAVOR WITH REGARD TO PLAINTIFF-APPELLANT'S CLAIM FOR WRONGFUL DISCHARGE IN VIOLATION OF PUBLIC POLICY WAS CONTRARY TO THE WEIGHT OF THE EVIDENCE."

{¶ 23} Hemphill contends that the jury's verdict in favor of the City was against the manifest weight of the evidence because the evidence "clearly demonstrated" that the City terminated Mr. Hemphill's employment in violation of the public policy against terminating employees for "the act of filing bankruptcy or activities connected with bankruptcy." As such, he claims that he was entitled to a new trial.

{¶ 24} The public policy at issue is set forth in 11 U.S.C. §525(a):

{¶ 25} "[A] governmental unit may not *** deny employment to, terminate the employment of, or discriminate with respect to employment against, a person that is or has been *** a bankrupt or a debtor under the Bankruptcy Act *** solely because such bankrupt or debtor is or had been *** a bankrupt or debtor under the Bankruptcy Act ***."

{¶ 26} Plainly, the language of the statute prohibits adverse employment actions *"solely because"* of bankruptcy proceedings. The City presented evidence that its termination of Hemphill's employment was for reasons other than his status as a bankrupt or debtor under the Bankruptcy Act. The Police Chief and Deputy Chief each testified that Hemphill was fired for dishonesty in his dealings with the bankruptcy court. Similarly, the Assistant City Manager testified that Hemphill was fired because "he had not been honest with the bankruptcy court about the fact that he had a job that paid a substantial amount of money." These witnesses denied that Hemphill's filing of a bankruptcy petition had been the sole reason or any part of the reason for the termination of his employment. The City also presented evidence that, when Hemphill attended to his personal business at the creditors' hearing at the bankruptcy court, he was on duty and was required to be in uniform.

{¶ 27} The jury, as the trier of fact, is in the best position to weigh the evidence presented, assess the credibility of the witnesses, and make an informed factual determination therefrom. *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80. An appellate court will not reverse the judgment of the trial court if the decision is supported by some competent, credible evidence going to all essential elements of the case. *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 280.

{¶ 28} In this case, there was ample evidence from which the jury could have reasonably concluded that Hemphill did not meet his burden of proving that the City terminated his employment solely because he had filed a bankruptcy petition and, thus, that his termination violated public policy. The trial court did not abuse its discretion in denying Hemphill's motion for a new trial, because the verdict was not against the manifest weight of the evidence.

{¶ 29} The fourth assignment of error is overruled.

IV

{¶ 30} Hemphill's first assignment of error states:

{¶ 31} "THE TRIAL COURT ERRED BY DENYING PLAINTIFF-APPELLANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT OR IN THE ALTERNATIVE FOR A NEW TRIAL."

{¶ 32} Hemphill argues that there was insufficient evidence to support the jury's verdict and that, as such, the trial court erred in denying his request for a judgment notwithstanding the verdict "or at least a new trial." His arguments under this assignment fall into several broad categories.

Jury Instructions and Interrogatories

{¶ 33} Hemphill claims that, when defense counsel prepared the final version of the jury instructions, defense counsel omitted "nearly a full page of jury instructions" that the parties had agreed to include. Hemphill admits that he did not object to or discover the alleged omission before the jury was "discharged for deliberations." But he claims that he should not be deemed to have waived the objection because defense counsel misled him by asserting that the only changes that had been made to the previously-discussed instructions related to the instruction on wrongful discharge. Hemphill also asserts that he "timely" objected to the omission after the jury was discharged.

{¶ 34} First, we note – and Hemphill acknowledges – that the parties' discussions about the jury instructions occurred off of the record. The City asserts that Hemphill's "recitation of the facts and circumstances surrounding the proposed jury instructions is absolutely incorrect" and

that it did not agree to include the language that Hemphill now claims the parties had agreed to include. Because the pertinent discussions about the jury instructions were not made a part of the record, Hemphill's claims about what the parties discussed or agreed to do with respect to the jury instructions cannot be verified. Under such circumstances, we cannot find that there was any agreement between the parties or that any agreement regarding the instructions was breached.

{¶ 35} Second, Hemphill claims that the parties agreed to give the following instruction:

{¶ 36} "In determining whether Defendants discriminated against Mr. Hemphill in terminating him, you may consider whether Defendants offered inconsistent, illogical or contradictory reasons for its [sic] decision. In other words, you may reasonably infer from any inconsistencies in Defendants' explanations that their explanations are false, and that they are therefore dissembling [sic] to cover up a discriminatory purpose. Such an inference is consistent with the general principle of evidence law that you, as the fact finders, are entitled to consider a party's dishonesty about a material fact as "affirmative evidence of guilt. (Unmatched quotation marks in original.)[5]

{¶ 37} "Any inconsistent explanations by Defendants for how or why Mr. Hemphill became separated from his employment are particularly significant. A shift in explanations on this matter is, on its own, sufficient to support an inference of discriminatory motive."

{¶ 38} The proposed instruction was not from Ohio Jury Instructions, and Hemphill's attorney acknowledged that it was based on his interpretation of several state and federal cases.

{¶ 39} The decision whether to give a requested jury instruction is a matter left to the sound discretion of the trial court, and its decision will not be disturbed on appeal absent an abuse

---

[5]The source of the quoted text is unclear from Hemphill's brief.

of discretion. *State v. Malloy*, Clark App. No. 09CA0092, 2011-Ohio-30, ¶37,citing *State v. Davis*, Montgomery App. No. 21904, 2007-Ohio-6680, ¶14. "Abuse of discretion" has been defined as an attitude that is unreasonable, arbitrary or unconscionable. Id., citing *Huffman v. Hair Surgeon, Inc.* (1985), 19 Ohio St.3d 83, 87. It is to be expected that most instances of abuse of discretion will result in decisions that are simply unreasonable, rather than decisions that are unconscionable or arbitrary; "a decision is unreasonable if there is no sound reasoning process that would support that decision." Id. at ¶37-38.

{¶ 40} The trial court instructed the jury on its responsibility to assess the credibility of witnesses by "apply[ing] the tests of truthfulness" which they apply in their daily lives, including "the appearance of the witness on the stand, the manner of testifying, the reasonableness of the testimony, the opportunity that each witness had to [perceive] the things concerning which he testified, accuracy of memory, frankness or lack of it, intelligence, interest, and bias, if any, together with all the facts and circumstances surrounding the testimony." The court further instructed the jurors that they were not required to credit any testimony simply because it was offered under oath, that they could believe or disbelieve "all or any part of the testimony of any witness" based on their assessment of whether the testimony was worthy of belief, and that they should apply "the usual rules for testing credibility and determining the weight" of the evidence. It also instructed the jurors that they were permitted to make inferences, which it defined as "a reasonable conclusion of fact which you may but are not required to make from other facts which you find to have been established by direct evidence." Additionally, the trial court instructed the jurors on "pretext:" "A pretext is a fictional reason or motive advanced to conceal a real one. If you believe the defendant's explanation for its decision to discharge Mr. Hemphill is pretextual or

false, you may take this into consideration when determining whether the defendants violated the federal statute."

**{¶ 41}** The trial court's instructions made clear that the jury was permitted to consider inconsistencies and contradictions in the City's evidence in weighing the credibility of that evidence, but did not expressly suggest – as the proposed instruction did – that the jury should treat the inconsistencies as "affirmative evidence of guilt." The trial court could have reasonably refused to give the proposed instruction, and Hemphill certainly was not unfairly prejudiced by its omission. Moreover, Hemphill was not precluded from arguing, and in his closing argument did argue, that the City had offered inconsistent or changing rationales for firing him. For example, Hemphill's attorney argued that "a false justification is not a true justification," "a false justification is not a real justification," and "[i]n other words, there was not a valid justification. There was a pretext ***."

**{¶ 42}** Hemphill also requested that the jury be instructed regarding constructive discharge as follows: "The employee resigned or left his job and claims that he was constructively discharged by the employer. The employer claims that the employee voluntarily resigned or left his job. If you find by the greater weight of the evidence that the employer, regardless of its intent, made the employee's working conditions so difficult and unpleasant that a reasonably prudent person under the same or similar circumstances would feel compelled to resign or leave employment, then you must find that the employee was constructively discharged."

**{¶ 43}** Hemphill did not present any evidence that Hemphill's resignation resulted from working conditions that were "difficult and unpleasant." Moreover, the issue at trial was the reason for Hemphill's discharge, not whether he had resigned or been discharged. Thus, the trial

court would have acted within its discretion in omitting this instruction.

{¶ 44} Further, Hemphill contends that the court's instructions "regarding discrimination pursuant to 11 U.S.C. §525(a)" were "diametrically opposite" and "inherently contradictory" to the wrongful discharge instructions contained in "3 Ohio Jury Instruction §3.02.17." He claims that he was prejudiced and suffered "unfair surprise," and that the alleged contradiction caused confusion. The trial court did not give the OJI instruction on wrongful discharge, and Hemphill does not claim that he requested that instruction. The trial court did explain to the jury that Hemphill claimed a violation of 11 U.S.C. §525(a), "which provides a governmental unit may not deny employment to, terminate the employment of, or discriminate with respect to employment against a person that is or has been a debtor" under the Bankruptcy Act solely because of that bankruptcy. The court also explained that, if Hemphill proved by the greater weight of the evidence that he was discharged in violation of 11 U.S.C. §525(a) or that his bankruptcy "was a determining factor in the employee's discharge and that *** the employer lacked an overriding business justification for discharge of the employee, then you will find for the employee." ("Overriding business justification" was defined separately.)

{¶ 45} With respect to the jury interrogatories, Hemphill contends that "the interrogatories submitted to the jury were inherently confusing," but he did not object to them on this basis. He cites cases dealing with contradictory verdict forms, but he does not specify how the interrogatories were contradictory in this case. He then simply concludes that he was entitled to judgment notwithstanding the verdict or to a new trial. In his reply brief, he explains that "because the jury did not receive the omitted instructions, the jury was not given the correct legal framework to be able to answer" the interrogatories.

**{¶ 46}** Before deliberations, the trial court, without objection, instructed the jurors on how to complete the verdict forms and interrogatories. The jurors completed general verdict forms in favor of the City, Davis, and Smith and one interrogatory finding that the City had not discharged Hemphill in violation of public policy as defined in 11 U.S. C. §525. It left blank the verdict forms in favor of Hemphill and interrogatories asking whether "Hemphill's status as a bankrupt or debtor" was a "determining factor" in his discharge, whether the City had an overriding business justification for the discharge, whether Hemphill should be reinstated, and related to damage calculations. These forms were not inherently contradictory or confusing. Moreover, as we discussed above, the trial court did not abuse its discretion in omitting the instructions that Hemphill claims to have requested about how the jury should weigh the alleged inconsistencies in the witnesses' testimony. Hemphill's argument that the interrogatories were unfairly confusing and contradictory is without merit.

Admissibility of Bankruptcy Judge's Impression of Hemphill's Honesty

**{¶ 47}** Hemphill claims that the trial court "should never have allowed a relitigation of any question of [his] honesty," which had been settled in the bankruptcy court. He claims that the trial court allowed the City to "prejudicially inject" the question of his honesty into the trial, but then refused to allow him to use "the best evidence of his honesty," i.e. the bankruptcy judge's "ruling" that he had not acted dishonestly. Thus, he claims that the trial court erred in overruling his motions in limine to preclude evidence that he acted dishonestly in the bankruptcy court and to preclude the bankruptcy trustee from testifying at trial. The trial court rejected Hemphill's arguments that collateral estoppel precluded such testimony.

**{¶ 48}** Issue preclusion, or collateral estoppel, precludes relitigation of an issue that has

been actually and necessarily litigated and determined in a prior action. *Fort Frye Teachers Assn. v. State Emp. Relations Bd.,* 81 Ohio St.3d 392, 395, 1998-Ohio-435. "More specifically, issue preclusion occurs when *** 'the same "issue" is involved in both actions; the issue was "actually litigated" in the first action, after a full and fair opportunity for litigation; the issue was "actually decided" in the first action, by a disposition that is sufficiently "final", "on the merits", and "valid"; it was necessary to decide the issue in disposing of the first action; and – in some decisions – the issue occupied a high position in the logical hierarchy of abstract legal rules applied in the first action; the later litigation is between the same parties or involves nonparties that are subject to the binding effect or benefit of the first action; the role of the issue in the second action was foreseeable in the first action, or it occupies a high position in the logical hierarchy of abstract legal rules applied in the second action; and there are no special considerations of fairness, relative judicial authority, changes of law, or the like, that warrant remission of the ordinary rules of preclusion.' (Footnotes omitted.)" *Fragoso v. Hydra-Matic Div. Chevrolet Motors, Inc.* (Nov. 14, 1986), Lucas App. No. L-86-033, quoting 18 Wright, Miller & Cooper, Federal Practice and Procedure (1981) 137-138, Section 4416.

{¶ 49} For several reasons, Hemphill's argument that claim preclusion barred all evidence with respect to his honesty in the bankruptcy proceedings is without merit. First, the resolution of whether Hemphill had been honest was not necessary to the bankruptcy court's proceeding. The hearing in the bankruptcy court related to whether Hemphill was permitted to sue the bankruptcy trustee for her statements to City officials. The bankruptcy court judge expressly stated that he "need not *** draw any conclusions as to the Debtor's [Hemphill's] character" for the purposes of that hearing, although he proceeded to comment that there did not appear to have

been an attempt to mislead the court.[6]  Moreover, as an employee-at-will, Hemphill could be terminated for any reason – even an arguably erroneous assessment of his honesty – or for no reason at all.   The jury in this case was not required to factually determine whether Hemphill had misled the bankruptcy court; it was only required to determine whether the City had terminated him because of his pending bankruptcy case, in violation of public policy.   Because a determination of Hemphill's honesty was not necessary to either of these cases, there was no claim preclusion.

{¶ 50} Second, collateral estoppel generally requires that the identity of persons and parties, or their privies,[7] be the same in the prior proceeding in order for the judgment or decree to operate as an estoppel; strangers to a judgment or decree will not be affected thereby.  *Goodson v. McDonough Power Equip., Inc.* (1983), 2 Ohio St.3d 193, 196, citing *Woodward v. Moore* (1862), 13 Ohio St. 136, 143.   Because the City was not a party to the proceedings in the bankruptcy court, that court's decision could not prevent  the City from litigating the issue of Hemphill's honesty, even assuming that issue were relevant to these proceedings.

{¶ 51} The trial court did not err in overruling Hemphill's motions to preclude evidence

---

[6] The trial court also notes that, during the hearing that preceded the bankruptcy court's decision, the bankruptcy judge "made clear that the hearing was unusual, was not a trial, was for the limited purpose of determining whether or not there existed a prima facie case against the trustee, that he did not 'need to know all the background, all the employment history or whatever it is you might want to present at trial', that the issues discussed can be subject to later cross-examination at a real trial, that no one was going to be bound by any representations made during the hearing, [and] that he was trying to keep this hearing 'from being used in some evidentiary manner in a subsequent proceeding.'" The transcript of this hearing in the bankruptcy court is not included in the record on appeal.

[7] See *Buckeye Retirement Co., LLC. v. Busch*, Greene App. No. 2010-CA-51, 2011-Ohio-1125.

related to his honesty in the bankruptcy proceedings; the court's conclusion that the doctrine of collateral estoppel did not apply because Hemphill's "honesty or lack thereof was not an issue that was fully litigated in a prior proceeding" was legally correct.

Impermissible Opinion Evidence

**{¶ 52}** Hemphill claims that Trustee Slone improperly offered opinion testimony "*as an expert*" (emphasis in brief) regarding Hemphill's honesty. He claims that Slone should not have been allowed to testify about Hemphill's truthfulness at all, because that was an issue for the jury. The City contends that Slone's testimony was lay opinion testimony and was permissible under Evid.R. 608.

**{¶ 53}** Evid.R. 608 states:

**{¶ 54}** "(A) Opinion and reputation evidence of character

**{¶ 55}** "The credibility of a witness may be attacked or supported by evidence in the form of opinion or reputation, but subject to these limitations: (1) the evidence may refer only to character for truthfulness or untruthfulness, and (2) evidence of truthful character is admissible only after the character of the witness for truthfulness has been attacked by opinion or reputation evidence or otherwise.

**{¶ 56}** "(B) Specific instances of conduct

**{¶ 57}** "Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness's character for truthfulness, other than conviction of crime as provided in Evid. R. 609, may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if clearly probative of truthfulness or untruthfulness, be inquired into on cross-examination of the witness (1) concerning the witness's character for truthfulness or

untruthfulness, or (2) concerning the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified."

{¶ 58} We disagree that Trustee Slone's testimony was offered or admitted pursuant to Evid.R. 608.

{¶ 59} At trial, Trustee Slone recounted that she had been contacted by Detective Rice of the Dayton Police Department in mid-April 2005, and that he had asked her whether she knew that Hemphill had a job with the City that paid $85,000 per year. Slone had not known this fact before her conversation with Rice. In a subsequent conversation, Detective Rice asked whether Slone would be willing to meet with some people from the City to discuss the bankruptcy proceedings and Hemphill's filings. She met with Davis, Smith, and Assistant City Manager Young. The City's attempt at trial to get Slone to recount the content of this conversation led to numerous objections by Hemphill and forms the basis of Hemphill's claim that Slone offered improper opinion testimony.

{¶ 60} According to Slone's trial testimony, she described the bankruptcy code and process to the City officials. She told them that Hemphill had a duty to disclose his income and that the impact of his substantial additional income from his employment with the City would probably be a conversion from a Chapter 7 to a Chapter 13 bankruptcy. She recounted that Hemphill had failed to disclose his income or the possibility of future income on the original bankruptcy petition in February and at the creditor meeting in April. Slone testified that, after she learned of Hemphill's employment with the City, she had sent a letter requesting (of Hemphill's attorney) that he amend the petition, but Hemphill's employment still had not been disclosed. She then called the attorney to tell him that she knew of Hemphill's employment, and

only then did the attorney disclose Hemphill's employment through a "second amended amendment to the petition."

{¶ 61} At trial, the City asked Slone whether she had said "anything to the group [at the meeting with City officials] about the truthfulness or untruthfulness of the debtor's disclosure." An argument among the attorneys ensued about whether such a question was permissible. After a bench conference and a break during which the court conducted some research, the court ruled that the City was permitted to ask Slone what she told the City officials at their meeting. The court expressed its reluctance to give a limiting instruction with respect to this testimony "because you put more emphasis for the jury on this particular issue," but the court agreed to give such an instruction because Hemphill's attorney wanted one.

{¶ 62} In response to the City's question about what she told the City officials, Slone testified:

{¶ 63} "[I]n my opinion there had been a pattern of untruthfulness. *** [I]t appeared it started with the nondisclosure in the petition. It continued with my examination of the debtor [at the creditor meeting] when any moment he could have said to me I got a job. I mean, if I'd gotten a job making eighty-five thousand dollars a year, I'd have been thrilled, but I didn't hear any of that. I didn't get any response to my first letter that was disclosive [sic], and not until I called the attorney did I get what appeared to be the truth. *** In my opinion, he was untruthful. ***

{¶ 64} "[A] major at the Dayton police force has got to know right from wrong. He had to know that he was not telling the truth. He had to know that he continued to not tell the truth. And that made me uncomfortable ***. He wasn't truthful. He didn't disclose. He didn't do

the continuing duty to disclose. I wouldn't have him as an employee, I remember saying that. And I remember saying I don't know whose fault it is [between Hemphill and his attorney], but in the end it doesn't matter ***. This gentleman signed the paperwork. This gentleman sat there and testified in front of me and he didn't disclose. That's what I told them."

{¶ 65} In the midst of this testimony, in response to an objection, the judge instructed the jury: "[T]he ultimate decision on this particular case with regard to the issue of the discharge and the reasons for it are for you, the jury, to decide."

{¶ 66} Hemphill's attorney then cross-examined Slone at length about whether the shortcomings in Hemphill's filings and disclosures could have been attributable to his attorney and about the possibility of mistakes made at the bankruptcy court. He also elicited testimony that Slone had specifically asked about Hemphill's wife's income at the creditor's meeting, but she had not asked any questions about his own income.

{¶ 67} The trial court did not give any further limiting instruction at the end of trial, and none was requested, that was specifically directed toward Slone's testimony about Hemphill's truthfulness.

{¶ 68} Because Hemphill had alleged wrongful discharge in violation of public policy, the pertinent question for the jury was whether Hemphill was asked to resign (or be fired) *solely because* he had filed a bankruptcy petition. Evidence that the City had other reasons to terminate Hemphill's employment was relevant to this determination. Slone's statement to the City officials that Hemphill had not been honest in his filings with the bankruptcy court was, indeed, Slone's opinion, based on her handling of the case. But it was presented to the jury as the basis for the City's actions, not as direct evidence of Hemphill's truthfulness. The City was permitted

to terminate an at-will employee, like Hemphill, for any reason or no reason at all as long as it did not do so for illegal reasons or in violation of public policy. Thus, the City was entitled to present evidence in support of its claim that Hemphill's failure to provide truthful information in court filings was the reason for his termination.

{¶ 69} Slone was the source of the City officials' belief that Hemphill had misled the bankruptcy court. Whatever Slone said to the City constituted "verbal acts," which were offered at trial to establish that the statements were made to the City, not that the statements were true. See, e.g., *Bryant v. Spear-Hardy*, Montgomery App. No. 23449, 2010-Ohio-1903, ¶37. The purpose of her testimony at trial was not to then render an expert opinion – or any opinion – as to Hemphill's truthfulness, but rather to testify as to what she told the City officials. It was not admitted at trial "for the truth of the matter asserted" (Evid.R. 801(C)) or as an opinion (Evid.R. 701 and 702) on Hemphill's honesty. The trial court did not abuse its discretion in permitting this testimony.

{¶ 70} Slone's additional comments about what a police officer should know, how a police officer should act, and that she would not have wanted someone like Hemphill as an employee were also opinions expressed to the City officials by Slone at their meeting. From our view, the trial court should have curtailed this testimony, which was based on Slone's emotions and personal beliefs more than on factual information upon which the City might reasonably rely in an employment decision. However, we are unpersuaded that Hemphill was unduly prejudiced by this testimony.

{¶ 71} Hemphill raises additional arguments under this assignment of error which are also the subject of separate assignments of error. We will address those arguments below.

{¶ 72} The arguments raised under this assignment of error do not demonstrate that the jury's verdict was supported by insufficient evidence or created a manifest injustice. As such, Hemphill was not entitled to a judgment notwithstanding the verdict or to a new trial based on these arguments.

{¶ 73} The first assignment of error is overruled.

V

{¶ 74} Hemphill's second assignment of error states:

{¶ 75} "THE TRIAL COURT ERRED BY DENYING PLAINTIFF-APPELLANTS' MOTION TO AMEND THE COMPLAINT TO CONFORM TO THE EVIDENCE."

{¶ 76} Hemphill asserts that the trial court abused its discretion in denying his motion to amend the pleadings to conform to the evidence.

{¶ 77} The trial began on October 6, 2008. On October 15, the last day of trial before closing arguments, Hemphill filed a Motion to Amend Pleadings to Conform to the Evidence, seeking to add claims for breach of contract and promissory estoppel. He claimed that the parties had "expressly tried" these issues. In support of these claims, Hemphill relied on the City's letter offering him employment, which had been offered by the City as an exhibit.

{¶ 78} The letter stated that Hemphill was being offered an "unclassified position" that was contingent on a satisfactory physical examination, residency in the City, and completion of a particular certification. It further stated that "[c]ontinued employment is contingent upon satisfactory reviews," and that his performance would be reviewed after six and twelve months. The letter also stated Hemphill's starting salary. It was signed by City Manager James T. Dineen.

{¶ 79} In his Motion to Amend the Pleadings to Conform to the Evidence, Hemphill

claimed that the statements in the letter were "a promise of continued employment" and "an enforceable contract" which "estopped [the City] from claiming that [he] was an employee at will." The trial court overruled the motion.

{¶ 80} Civ.R. 15(B) states: "When issues not raised by the pleadings are tried by express or implied consent of the parties, they shall be treated in all respects as if they had been raised in the pleadings. Such amendment of the pleadings as may be necessary to cause them to conform to the evidence and to raise these issues may be made upon motion of any party at any time, even after judgment. ***" An appellate court reviews a trial court's ruling on a Civ.R. 15(B) motion for abuse of discretion. *Spisak v. McDole* (1984), 15 Ohio St.3d 62, 63.

{¶ 81} The record refutes Hemphill's claim that the case was "expressly tried" as a breach of contract or promissory estoppel claim. The evidence established that Hemphill knew he was an unclassified employee and could be dismissed for any reason. Moreover, in response to the City's motion for summary judgment, Hemphill stated that he did not contest that he was an at-will employee. Indeed, he acknowledged in his Modified Response to the City's motion for summary judgment that an action for "wrongful discharge in violation of public policy serves to afford at-will employees protection from employers who unilaterally terminate employees for abusive reasons." Thus, Hemphill himself seems to have acknowledged – before his motion to amend the pleadings – that his claim for discharge in violation of public policy was inconsistent with a claim that his employment was governed by contract or that the City was estopped from arguing that he was an at-will employee. We find no abuse of discretion in the trial court's refusal to amend the pleadings.

{¶ 82} Moreover, in its decision overruling Hemphill's motions for judgment

notwithstanding the verdict and for a new trial, the trial court concluded that the letter upon which Hemphill relied in attempting to add a breach of contract claim did not, as a matter of law, constitute an employment contract. "'In the absence of facts and circumstances which indicate that the agreement is for a specific term, an employment contract which provides for an annual rate of compensation but makes no provision for the duration of employment, is not a contract for one year, but is terminable at will by either party.' *[Henkle v. Educational Research Council* (1976), 45 Ohio St.2d 249, syllabus.] The letter [Hemphill] characterized as an employment contract did not contain a definite term of employment. Therefore, it could not be considered as a valid contract claim to the jury." The trial court correctly concluded that the letter in question did not establish a contract for employment. Because of that legal conclusion and the other arguments advanced by Hemphill that were inconsistent with a finding of contractual employment, the court did not abuse its discretion in refusing to add a claim for breach of contract.

{¶ 83} With respect to his attempt to add a claim for promissory estoppel, Hemphill argues that "even if *** the letter did not constitute a contract, the letter still contained a representation, upon which Hemphill reasonably relied, that if he accepted the position he would be guaranteed employment for at least six months."

{¶ 84} To be successful on a claim of promissory estoppel, "[t]he party claiming the estoppel must have relied on conduct of an adversary in such a manner as to change his position for the worse and that reliance must have been reasonable in that the party claiming estoppel did not know and could not have known that its adversary's conduct was misleading. *Ohio State Bd. of Pharmacy v. Frantz* (1990), 51 Ohio St.3d 143, 145, 555 N.E.2d 630, citing *Heckler v.*

*Community Health Serv.* (1984), 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42." *Shampton v. Springboro*, 98 Ohio St.3d 457, 2003-Ohio-1913, ¶34.

{¶ 85} The letter's reference to performance reviews could not have reasonably been construed as a guarantee of employment for the review period. Moreover, because the letter upon which Hemphill relies, along with various statements that were made to him during the interview process, demonstrate that he did not have an employment contract, but was an employee at-will, he could not have reasonably relied on the letter as a guarantee of a certain term of employment.

{¶ 86} Moreover, as the City points out, the City Charter states that the City Attorney "shall prepare all contracts *** in which the city is concerned and shall endorse on each his approval of the form and correctness thereof" and that "[a]ll contracts *** entered into *** contrary to the provisions of the preceding sections, shall be void." Dayton Charter Section 55 and 92. The letter on which Hemphill relied was not prepared by the City Attorney, and thus did not meet these requirements. "Persons seeking to enter into a contractual relationship with a governmental entity are on constructive notice of the statutory limitations on the power of the entity's agent to contract. *Bohach v. Advery,* Mahoning App. No. 00-CA-265, 2002-Ohio-3202. Since state and local laws are readily available for public review, it is a simple matter for a party to educate itself as to the procedural formalities with which government officials must comply before they may bind a governmental entity to a contract." *Shampton* at ¶34. Thus, even if the letter had set forth a specific term of employment (which it did not), Hemphill could not legally have reasonably relied on it.

{¶ 87} Finally, the trial court could have reasonably concluded that the City would have been prejudiced by amendment of the pleadings after the presentation of all of the parties'

evidence at trial. Although Civ.R. 15(B) does contemplate amendments late in trial and "even after judgment," such an amendment is premised on the existence and prior presentation of evidence that supported the claims to be added by virtue of the amendment. In this case, contrary to Hemphill's claims, the evidence presented at trial did not presume or establish a contract between the parties or a basis for promissory estoppel. The City did not conduct its depositions or present its evidence at trial with the express or implicit understanding that a breach of contract claim was at issue. This fact distinguished this case from circumstances in which a request to amend a pleading to conform to the evidence might be appropriate. The trial court could have reasonably refused Hemphill's request to amend the pleading because the City would have been prejudiced thereby.

{¶ 88} Hemphill was not entitled to a judgment notwithstanding the verdict or a new trial based on the trial court's refusal to amend the pleading at the end of trial.

{¶ 89} The second assignment of error is overruled.

VI

{¶ 90} Hemphill's third assignment of error states:

{¶ 91} "THE TRIAL COURT ERRED BY GRANTING SUMMARY JUDGMENT TO APPELLEES ON PLAINTIFF-APPELLANT'S DUE PROCESS CLAIM FOR A NAME-CLEARING HEARING."

{¶ 92} Hemphill claims that he introduced evidence creating issues of fact regarding each of the elements required to justify a name-clearing hearing. As such, he asserts that the trial court erred in granting summary judgment in favor of the City on his due process claim for a name clearing hearing and in denying his motion for judgment notwithstanding the verdict or for a new

trial, in which he reasserted this claim.

{¶ 93} Hemphill appeals from the denial of his motion for a judgment notwithstanding the verdict and for a new trial but, under this assignment of error, he asks us to review the trial court's decision granting summary judgment to the City on his claim for a name-clearing hearing. Although Hemphill challenged the trial court's summary judgment on the name-clearing hearing in his post-trial motion, any issue on which summary judgment was granted – including the right to a name-clearing hearing – obviously was not tried, so it is not clear to us that the trial court's decision on a summary judgment motion is a proper subject of a motion for judgment notwithstanding the verdict or a new trial. We also note that the standard of review for a summary judgment, which is a question of law and reviewed de novo, is different from that for a new trial, which is reviewed for an abuse of discretion.

{¶ 94} Summary judgment should be granted only if no genuine issue of material fact exists, the moving party is entitled to judgment as a matter of law, and reasonable minds can come to but one conclusion, which is adverse to the nonmoving party. Civ.R. 56; *Harless v. Willis Day Warehousing Co.* (1978), 54 Ohio St.2d 64, 66. An appellate court reviews summary judgments de novo, meaning that we review such judgments independently and without deference to the trial court's determinations. *Koos v. Central Ohio Cellular, Inc.* (1994), 94 Ohio App.3d 579, 588.

{¶ 95} Upon a motion for summary judgment, the moving party bears the initial burden of showing that no genuine issue of material fact exists for trial. *Dresher v. Burt* (1996), 75 Ohio St.3d 280, 292-93. Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. Id.; Civ.R. 56(E). Rather, the burden then shifts to the non-moving party to respond, with affidavits or as otherwise permitted

by Civ.R. 56, setting forth specific facts which show that there is a genuine issue of material fact for trial. Id. Throughout, the evidence must be construed in favor of the non-moving party. Id.

**{¶ 96}** As we stated above, the standard of review for a motion for judgment notwithstanding the verdict is the same as that for a directed verdict: Construing the evidence most strongly in favor of the party against whom the motion is directed, the motion must be overruled unless reasonable minds could reach no other conclusion but that, under the applicable law, the movant is entitled to judgment in his favor. Civ.R. 50; *Texler,* 81 Ohio St.3d at 679.

**{¶ 97}** We will consider this assignment as an appeal of the summary judgment, which seems to be a standard of review that favors Hemphill.

**{¶ 98}** Hemphill relies on *Quinn v. Shirey* (C.A.6, 2002), 293 F.3d 315, in support of his claim that he was entitled to a name-clearing hearing. *Quinn* discussed the due process rights that may create a right to a name clearing hearing:

**{¶ 99}** "The Fourteenth Amendment forbids state actors from depriving individuals of life, liberty or property without due process of law. See *Mertik* [*v. Blalock* (C.A.6, 1993], 983 F.2d [1353], at 1359; see also *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 569-70, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972); ***. Except in exceptional circumstances, *** before a person is deprived of either a liberty or property interest, he has a right to some kind of hearing. *Roth,* 408 U.S. at 570 n. 7, 92 S.Ct. 2701. '[A] person's reputation, good name, honor, and integrity are among the liberty interests protected by the due process clause of the fourteenth amendment.' However, defamation alone is not enough to invoke due process concerns. Some alteration of a right or status 'previously recognized by state law,' such as employment, must accompany the damage to reputation." *Quinn*, 293 F.3d at at 319-320, (some internal citations omitted.)

{¶ 100} Hemphill was an unclassified, at-will employee, and the trial court properly concluded that he did not have a property interest in his continued employment. See *Suso v. Ohio Dept. of Development* (1993), 93 Ohio App.3d 493, 499; *Shearer v. Cuyahoga Cty. Hosp., Sunny Acres* (1986), 34 Ohio App.3d 59, 60. Hemphill has not advanced a specific argument in support of his cursory claim that he had a property right to continued employment. Thus, we will limit our discussion of this assignment to the alleged liberty interest, relying on the *Quinn* factors, as Hemphill did.

{¶ 101} *Quinn* identified several factors that a plaintiff must show in order to establish that he was deprived of a liberty interest and entitled to a name-clearing hearing with respect to termination from employment: 1) the stigmatizing statements must be made in conjunction with the plaintiff's termination from employment; a plaintiff is not deprived of his liberty interest when the employer has alleged merely improper or inadequate performance, incompetence, neglect of duty or malfeasance; 2) the stigmatizing statements or charges must be made public; 3) the plaintiff must claim that the charges made against him were false; and 4) the public dissemination of the information must have been voluntary. Id., citing *Brown v. City of Niota* (C.A.6, 2000) , 214 F.3d 718, 722-23. If these elements have been established, the plaitiff is entitled to a name-clearing hearing if he requests one. Id., citing *Brown*, 214 F.3d at 723.

{¶ 102} In its decision granting the City's motion for summary judgment, the trial court rejected Hemphill's claim that he was entitled to a name-clearing hearing on the basis that he had never requested one. Hemphill does not directly refute this claim, but he points to his deposition testimony that he "had attempted to explain what had happened" after he heard of Slone's statements to the City officials, but was not allowed to do so. He also points to his testimony that

he "was denied the opportunity to consult with an attorney, who would have informed him of his 'right' to a name-clearing hearing."

{¶ 103} In its decision denying Hemphill's motion for judgment notwithstanding the verdict, the trial court stated that Hemphill was not entitled to a name-clearing hearing because "there is no evidence that the Dayton Police Department created and disseminated false and defamatory information" about him.

{¶ 104} Hemphill relies on three pieces of evidence in support of his claim that the City disseminated false or "stigmatizing" statements about him: 1) his affidavit in support of his motion for summary judgment, paragraph 9, in which he stated that "[a]t one point the Dayton Daily News printed an article discussing my termination and lawsuit, as well as my criminal prosecution. The Daily never printed an article about how I was acquitted;" 2) his deposition testimony that he "was told that if he did not resign, the accusations of dishonesty against him would be made public;" and 3) the City's issuance of a press release announcing his resignation. According to Police Chief Davis's testimony, the press release stated that Hemphill had resigned for "personal reasons" and did not mention the bankruptcy proceedings; Hemphill did not refute this assertion.

{¶ 105} The trial court correctly concluded that Hemphill did not present any evidence to create a genuine issue of material fact that the City had released false or defamatory statements about him; thus, he failed to set forth a prima facie case that he was entitled to a name-clearing hearing. The statement in Hemphill's affidavit recounted only the actions of the Dayton Daily News; it did not allege, much less substantiate, a claim that the City was responsible for the content of the DDN articles. The City's alleged threat to go public with the reasons for

Hemphill's termination, which was conditioned on his refusal to resign, did not constitute dissemination of information, only the threat to disseminate information. Even assuming that such a threat was made, it did not create a right to a name-clearing hearing, because the information which Hemphill would have presumably sought to rebut had never been released. The City's announcement of Hemphill's resignation "for personal reasons" was not defamatory in itself. In sum, Hemphill pointed to no evidence that the City disseminated false or defamatory information about him. The trial court properly granted the City's motion for summary judgment and overruled Hemphill's motion for a judgment notwithstanding the verdict.

{¶ 106} We are reluctant to construe Hemphill's "attempt to explain" his actions as a request for a name-clearing hearing, and we do not believe that the City's alleged denial of "the opportunity to consult with legal counsel" prior to his resignation excused Hemphill from any obligation he might have had to request a name-clearing hearing. However, because we agree with the trial court's conclusion that Hemphill did not present evidence sufficient to warrant a name-clearing hearing, we believe that the trial court's additional finding that Hemphill had failed to request such a hearing was immaterial to the outcome of the claim.

{¶ 107} The third assignment of error is overruled.

VII

{¶ 108} Hemphill's fifth assignment of error states:

{¶ 109} "THE TRIAL COURT ERRED BY SUBMITTING INCONSISTENT AND ERRONEOUS INSTRUCTIONS AND INTERROGATORIES TO THE JURY."

{¶ 110} Under this assignment of error, Hemphill reiterates the argument raised in the first assignment of error that the jury instructions were incorrect and that the interrogatories confused

the jury. We fully addressed this argument above, and we rely on that discussion.

**{¶ 111}** The fifth assignment of error is overruled.

VIII

**{¶ 112}** Hemphill's sixth assignment of error states:

**{¶ 113}** "THE TRIAL COURT ERRED BY ALLOWING APPELLEES' COUNSEL TO INTRODUCE EVIDENCE OF EXTRANEOUS MATTERS."

**{¶ 114}** Hemphill claims that the City "attempt[ed] to assassinate [his] character" by introducing evidence of "extraneous matters" related to his military record and his smoking. The City contends that the testimony it elicited with respect to Hemphill's military record was permissible impeachment of testimony elicited on direct examination, and that it did not introduce any evidence that Hemphill was a smoker.

**{¶ 115}** Hemphill testified on direct examination that he had been in the Air Force for more than twenty years, during which he had been a major for nine years, and that he had been honorably discharged. He testified on direct that neither his integrity nor his job performance had ever been questioned, and that in his many years of public service, he had "never had a question" about his conduct. (See, e.g., T. 797).

**{¶ 116}** On cross-examination, the City's attorney questioned Hemphill about a situation in which he had been relieved of his command in Utah because he assaulted a special agent. The City also elicited testimony that, while he was a major in the Air Force, Hemphill had been passed over for promotion two times, which was the maximum number of times he was eligible to be considered for promotion.

**{¶ 117}** Evid.R. 611(B) permits cross-examination "on all relevant matters and matters

affecting credibility." Thus, the City was permitted to explore the truthfulness of Hemphill's characterization of his conduct in the military and his assertion that his integrity and job performance had never been questioned. The City did not attempt to prove these matters through extrinsic evidence, which would have been impermissible under Evid.R. 608(B); Hemphill acknowledged these facts. The trial court did not err in permitting this testimony.

{¶ 118} Hemphill also claims that the City "established that [he] was a smoker *** for no other reasons than to make [him] look bad." Hemphill has not pointed to any part of the record where the City raised this issue. Rather, it came up when Hemphill's attorney was cross-examining Deputy Chief Smith about when and where officers were required or permitted to be in uniform. Smith testified that police officers are not supposed to wear their uniforms when they are not at work, and Hemphill's attorney attempted to frame the department's rule in terms of whether an officer was "inside the building" or "outside the building." In response, Smith clarified that the requirement that officers be in uniform is not limited to when they are inside the building: "If I believed that, when he [Hemphill] went outside the building to smoke, which he did quite often, he would have to change his uniform and go outside and smoke a cigarette and come back in, and that was not the intent" of the uniform rule. Hemphill did not object to this response, and he has not demonstrated that he was prejudiced by it. Moreover, it is clear that this testimony was not elicited by the City, nor did the City refer to it in closing argument.

{¶ 119} The sixth assignment of error is overruled.

IX

{¶ 120} The seventh assignment of error states:

{¶ 121} "THE TRIAL COURT ERRED BY FAILING TO CURB OR CORRECT

MISCONDUCT BY APPELLEES' COUNSEL, AND BY FAILING TO MAINTAIN CONTROL OF THE TRIAL."

{¶ 122} Hemphill claims that he is entitled to a new trial because the trial court failed to "correct" defense counsel's abuse of witnesses and his disregard for the rules of evidence, let defense counsel "run rampant," and generally failed to control the trial.

{¶ 123} Under this assignment, Hemphill incorporates a portion of his argument under the first assignment of error. He refers to the misconduct "discussed *** in detail above" and generally characterizes it as "the long list of improper questions, introductions of foreign matters, and mistreatment of witnesses."

{¶ 124} Hemphill's argument in support of this assignment of error is mostly a recitation of law. Where he does refer to specific instances of misconduct, they focus primarily on the City's efforts to impugn his truthfulness and to portray him as dishonest. According to Hemphill, his "'dishonesty' was a prejudicial 'non-issue,'" because the bankruptcy court had already "determined" that he was not dishonest. As we discussed above, the bankruptcy judge's comment, in a proceeding focused on whether Hemphill could sue the bankruptcy trustee for defamation, did not "determine" the issue or preclude the presentation of evidence about Hemphill's conduct in bankruptcy proceedings. Whether the City had reason to doubt that Hemphill was truthful in his court filings was central to the City's rationale for terminating his employment; it was not a "non-issue." Thus, defense counsel's references in his opening statement, on cross-examination, and in closing argument to Hemphill's truthfulness and honesty were relevant and permissible, and they did not imply facts not in evidence.

{¶ 125} Hemphill also contends that the City "went to great lengths to highlight"

Hemphill's wife's prior bankruptcy so as to cast them as "debtors trying to take advantage of the system." However, the prior bankruptcy was not discussed at length. It appears that defense counsel's primary purpose was to establish how Hemphill had first come into contact with his bankruptcy attorney and his basic understanding of bankruptcy procedures. Moreover, Hemphill did not object to these references to the prior bankruptcy.

{¶ 126} We have previously discussed some of the other issues raised by Hemphill under this assignment. For example, he reiterates his claim that defense counsel acted improperly in accusing Hemphill of being "passed over" for promotion twice in the Air Force. Hemphill testified to this fact on cross-examination– it was not merely an accusation – and the question about Hemphill's promotions was reasonable rebuttal of his characterization that his job performance had always been exemplary. Hemphill also repeats his argument that the City acted improperly in presenting evidence, in its case in chief, that Hemphill was a smoker; he characterizes this evidence as "one more effort to hack away at his character." This claim finds no support in the record. Smith's comment that Hemphill was a smoker was elicited, without objection, during his own attorney's cross-examination of the witness, not during the defense's case, and the defense did not comment on it in closing argument. There is simply no way to characterize this testimony as abusive or improper conduct by defense counsel, and it did not entitle Hemphill to a judgment notwithstanding the verdict or a new trial.

{¶ 127} The seventh assignment of error is overruled.

X

{¶ 128} The eighth assignment of error states:

{¶ 129} "THE COURT OF APPEALS SHOULD GRANT JUDGMENT TO

APPELLANTS."

{¶ 130} Hemphill's eighth assignment of error consists of a conclusory diatribe against defense counsel, whom Hemphill's attorney describes as "unprofessional" and as a "kamikaze" on a "suicide mission" who is "drawing a paycheck" from the "unlimited resources" of the taxpayers. Hemphill urges us to disqualify defense counsel and his firm from the case, enter judgment in his favor, and remand for a trial on damages.[8]

{¶ 131} The record does not support any of Hemphill's counsel's calumny, and Hemphill is not entitled to judgment in his favor.

{¶ 132} The eighth assignment of error is overruled.

XI

{¶ 133} In sum, we conclude that, construing the evidence most strongly in favor of the City, reasonable minds could have found for the City on all of Hemphill's claims. Thus, the trial court did not err in denying his motion for a judgment notwithstanding the verdict. We also conclude that the trial court did not abuse its discretion in denying the motion for a new trial, because the evidence reasonably supported the jury's verdict, and no manifest injustice was demonstrated.

{¶ 134} The judgment of the trial court will be affirmed.

---

[8] In Hemphill's brief, he footnotes Rule of Professional Conduct 3.4, arguably implying that defense counsel violated the Rules. Hemphill's attorney, at oral argument, in response to a question from the bench, specifically disavowed any such allegation, which would trigger a duty to report it to the appropriate authorities. Ohio R. Prof. Conduct 8.3(a). Failure to report a violation is itself a violation of the Ohio Rules of Professional Conduct. Id. At the same time, unfounded allegations of a violation might themselves be a violation. For extreme examples, see *Disciplinary Counsel v. Baumgartner*, 100 Ohio St.3d 41, 2003-Ohio-4756; *Disciplinary Counsel v. Frost*, 122 Ohio St.3d 219, 2009-Ohio-2870.

. . . . . . . . . .

GRADY, P.J. and FAIN, J., concur.

Copies mailed to:

Dwight D. Brannon
Neil F. Freund
Leonard J. Bazelak
Hon. Frances E. McGee